**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Randolph L. Chambers


      v.                                Civil No. 06-cv-449-PB


Dr. Eppolito, et al.[1]


**REPORT AND RECOMMENDATION**


Before the Court is Randolph Chambers' complaint (document

nos. 1 & 10),[2] filed pursuant to 42 U.S.C. § 1983.  Chambers, an

---

[1]Plaintiff has not provided a first name for Dr. Eppolito.
The other defendants named in the complaint are Nurse Gail
McKenna, Nurse Practitioner Judy Baker, the medical departments
of the New Hampshire State Prison ("NHSP") and the Northern New
Hampshire Correctional Facility ("NCF"), NCF Warden Larry
Blaisdell, NCF Chaplain Hoyt, and New Hampshire Department of
Corrections ("NHDOC") Commissioner William Wrenn.  I construe the
claim against the NCF medical department to be against NCF
medical director Robert McLeod, who I find Chambers intended to
name as a defendant.  I further find that Chambers intended to
name Unit Manager Thyng, Unit Counselor Judy Smiley, Major Cox,
NHSP Warden Bruce Cattell, and NHDOC Deputy Commissioner Greg
Crompton as defendants, as they are alleged in the body of the
complaint to have caused the harm alleged by Chambers.

[2]Chambers filed his initial complaint in this matter
(document no. 1) on December 1, 2006.  Chambers then filed an
amended complaint on March 7, 2007 (document no. 10).  I find
that these documents, considered together, will comprise the
complaint in this matter for all purposes.  Any future amendment
to the complaint will need to proceed by proper motion to amend
filed pursuant to United States District Court for the District
of New Hampshire Local Rule 15.1.

inmate at the New Hampshire State Prison ("NHSP"), alleges that the defendants, employees of the New Hampshire Department of Corrections ("NHDOC"), have violated a number of his rights during his incarceration.  The complaint is before me for preliminary review to determine whether, among other things, it states any claim upon which relief might be granted.  See 28 U.S.C. § 1915A; United States District Court for the District of New Hampshire Local Rule ("LR") 4.3(d)(2).  For the reasons stated herein, I recommend that the following claims be dismissed: ADA and Rehabilitation Act claims alleging inadequate pain medication, the claims alleging denial of medical specialists, medical testing, failure to wake Chambers for medication, and denial of a video game, and the § 1983 claim for a denial of free medical care.  I also recommend that defendants Cox and Crompton be dismissed from this action.  I direct, in an Order issued simultaneously with this Report and Recommendation (hereinafter the "Simultaneous Order"), that the claim alleging an Eighth Amendment violation for denial of pain medication proceed against defendants Blaisdell, McLeod, Baker, Wrenn, and Eppolito; the ADA and Rehabilitation Act claim for the denial of accommodations in the form of passes proceed against defendants

McKenna, Eppolito, and Baker; the inadequate vision care claims proceed against defendants Thyng, Smiley, Cattell, and Wrenn; and the kosher diet, free exercise, and due process claims proceed against defendant Hoyt.

<u>Standard of Review</u>

Under this Court's local rules, when an incarcerated plaintiff commences an action pro se and in forma pauperis, the magistrate judge must conduct a preliminary review and prepare a report and recommendation discussing whether the complaint or any portion thereof should be dismissed because:

> (i)the allegation of poverty is untrue, the action is frivolous, malicious, or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief under 28 U.S.C. § 1915A(b); or
>
> (ii) it fails to establish subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

LR 4.3(d)(2). In conducting the preliminary review, the Court construes pro se pleadings liberally in favor of the pro se party. <u>See</u> <u>Ayala Serrano v. Lebron Gonzales</u>, 909 F.2d 8, 15 (1st Cir. 1990) (following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)). "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was

3

imperfectly pled." <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997), <u>cert. denied</u>, <u>Ahmed v. Greenwood</u>, 522 U.S. 1148 (1998).

At this preliminary stage of review, all factual assertions made by the plaintiff and inferences reasonably drawn therefrom must be accepted as true.  <u>See</u> <u>Aulson v. Blanchard</u>, 83 F.3d 1, 3 (1st Cir. 1996) (stating the "failure to state a claim" standard of review and explaining that all "well-pleaded factual averments," not bald assertions, must be accepted as true).  This review ensures that pro se pleadings are given fair and meaningful consideration.  <u>See</u> <u>Eveland v. Dir. of C.I.A.</u>, 843 F.2d 46, 49 (1st Cir. 1988).

<u>Background</u>

I.  <u>Denial of Adequate Medical Care</u>

    A.  <u>Pain Medication</u>

Chambers has a number of serious medical problems which cause him a great deal of pain.  Chambers needs regular medical attention, both to treat his underlying medical issues and to manage his pain.  Chambers alleges that on or about December 8, 2005, he was transferred from the NHSP to the Northern New Hampshire Correctional Facility ("NCF").  On or about December 9,

4

2005, Chambers saw defendant Baker, a nurse practitioner who continued the pain treatment medication that Chambers had been receiving at the NHSP, which was 15mg of morphine administered in a time-release formula twice a day.  Baker increased the dosage of morphine to 30mg twice a day when 15mg was no longer effective in lasting through the day.  Shortly thereafter, Chambers also needed "in between" medication to manage his pain between doses of morphine.  For that, Baker prescribed 100mgs of Tramadol, to be administered three times a day.  Chambers received this dose of Tramadol in December of 2005 and January of 2006.  In addition, to manage pain, Chambers was prescribed lidocaine patches.  Two lidocaine patches were placed on Chambers' back each evening at 9:00.  Due to Chambers' medical conditions, it was painful for him to engage in the twisting and turning necessary to remove the patches himself.  The nurse on duty the following morning would remove the patches for Chambers prior to administering his first dose of pain medication.

On June 13, 2006, Chambers reports that defendant McKenna was the nurse working the morning shift.  Chambers went to see her to get his medication and to have his lidocaine patches removed.  McKenna refused to remove the patches, and made

Chambers do it himself.  Chambers says that this caused him a great deal of pain.  After that incident, Chambers wrote a request slip to the NCF doctor, Eppolito, asking that his medical chart instruct the nurses to remove the lidocaine patches. Eppolito saw Chambers on June 26, 2006, and watched Chambers try to remove the patches.  Eppolito determined that it was necessary for a nurse to assist in the removal of the patches.  Eppolito noted in Chambers' chart that a nurse should remove the patches. McKenna, however, still refused to remove the patches for Chambers.  Chambers reports that McKenna even withheld Chambers' pain medication until Chambers removed the patches himself.

On June 22, 2006, Chambers wrote to the NCF medical director, Robert McLeod, about nurses removing his lidocaine patches, but did not receive an answer.  On July 2, 2006, Chambers wrote to Eppolito and NCF Warden Blaisdell complaining about McKenna's actions.  Blaisdell responded that the situation was "taken care of."  Chambers also filed grievances, addressing his complaint about McKenna's actions, to Baker and NHDOC Commissioner William Wrenn.  The situation was not remedied. Chambers claims that, instead, Baker halved his morphine dosage

and discontinued the use of lidocaine patches in retaliation for the grievances he had filed concerning McKenna.

On July 20, 2006, Chambers wrote to Baker but received no response.  On August 2, 2006, Chambers wrote to Baker again about restarting his pain medication.  On August 8, 2006, Baker responded to Chambers and told him to report to sick call when he returned to NCF.[3]  On August 9, 2006, Chambers went to sick call. Baker did not see Chambers at that time.

Instead, on August 9, 2006, Chambers saw McKenna.  Chambers asked McKenna for an elevator pass, as he had had a bad flare-up of his asthma and had recently been on a "breathing machine." Without an elevator pass, Chambers was forced to walk up three flights of stairs to reach his housing unit, which caused him a great deal of pain.  Chambers also requested that he be given a pass for the further use of a breathing machine.  McKenna denied Chambers both passes.[4]  Eppolito also refused to grant Chambers an elevator pass.  Chambers further alleges that he asked Baker

---

[3]Chambers had been placed at the Secure Housing Unit at the NHSP and then returned to the NCF on August 9, 2006.  The complaint does not state the reason for this temporary housing change.

[4]Chambers alleges that between August 16 and August 25, 2006, he was granted an elevator pass.  However, the elevator was broken during this period.

and Eppolito to arrange for him to see a respiratory specialist, as he had been treated nine times for breathing problems by NHDOC medical staff and had never received a diagnostic evaluation, from a specialist or otherwise, to determine the root of his respiratory difficulties.  Chambers' request for a respiratory specialist was denied.  Additionally, Baker took away passes issued to Chambers allowing him to move slowly through the prison, and allowing him to have a plastic chair in his cell.

Baker then refused to see Chambers, and instead referred all of Chambers' requests for medical care directly to Eppolito. Eppolito told Chambers that he would recommend that Chambers go to a pain management specialist, and that he would follow the pain specialist's recommendations.  An NHDOC committee, however, denied Chambers' request to see a pain management specialist. Chambers' NHDOC physical therapist, Bernie Campbell, recommended that Chambers get a diagnostic MRI test.  Chambers reports that despite Campbell's recommendation, he had yet to receive an MRI at the time this action was filed.

On October 17, 2006, Chambers saw Eppolito and asked for additional "in between" medication.  Eppolito got mad at Chambers for making that request and left the room.  Eppolito refused to

8

provide Chambers with additional treatment for pain.  Chambers
states that he wrote a request slip that was disrespectful to
Eppolito.  Chambers alleges that Eppolito's denial of necessary
treatment for Chambers' pain was retaliation for the
disrespectful request slip.  Specifically, Eppolito retaliated
against Chambers by reversing his own medical judgment that
Chambers needed 30mg of morphine twice daily, and allowing Baker
to reduce the dosage to 15mg twice daily, and then to further
reduce the dosage to 20mg of a morphine formula that did not
provide time-released pain relief.  Eppolito did this, Chambers
claims, knowing that it would cause an increase in Chambers' pain
level.

Chambers also states that he received three disciplinary
reports for missing three pain medication dispensation
appointments at NCF, and also failing to go to the medical
department to sign a form indicating that he refused his narcotic
pain medications.  Chambers asserts that for each offense a five
dollar fee was assessed against him.  When Chambers appealed the
disciplinary finding, the appeal was denied by Cox, who stated
that Chambers was required to wake himself up to get his pain
medications.  Chambers states that diabetics and inmates with

appointments for blood tests are woken up to receive their
medication or have their blood drawn, but that inmates are not
woken up to get pain medication.  Chambers appealed the denial to
Blaisdell and Wrenn.  Both appeals were denied.

     B.   <u>Vision Care</u>

Chambers wrote to Thyng to request an appointment to have
his eyes examined.  Chambers' unit counselor, Judy Smiley,
responded to his request, telling Chambers that there was no
NHDOC eye doctor, that twenty inmates are scheduled to see an eye
doctor every two months, and that there is a nine to ten month
waiting list to see an eye doctor.  Chambers grieved the denial
of an eye doctor appointment to Cattell and Wrenn, but his
appeals were denied.  Chambers further alleges that when he was
transferred to the NHSP from the NCF to serve time in punitive
segregation on December 7, 2006, his eyeglasses were lost during
the transport.  He requested new glasses and was told that he was
only entitled to receive a new pair of glasses from the NHDOC
every two years, and, therefore, he was not eligible for new
glasses until April of 2007.  Chambers was also advised that he
could request new glasses from Concord Eye Care, rather than
through the NHDOC, but that he would have to pay for the eye exam

and glasses himself.[5]  Chambers has been without eyeglasses since
December 7, 2006,[6] which he alleges has caused his vision to
worsen.

2.  Charges for Medical Appointments

Chambers alleges that he is being charged for his sick call
visits, even when he has no money in his inmate account.  As a
result, Chambers alleges that his inmate account is overdrawn.

3.  Denial of Kosher Diet

Chambers claims that during the time he was housed at NCF,
Chaplain Hoyt took away his kosher diet.  Chambers claims that he
was not provided with due process or an opportunity to be heard

---

[5]Chambers was told that if he wished, he could make a claim
for lost property against the State of New Hampshire, and apply
any reimbursement he received for his lost glasses to the cost of
new eyeglasses.  Claims alleging the theft, damage, loss or other
misappropriation of property are not actionable under 42 U.S.C. §
1983 where, as here, the state has an adequate post-deprivation
remedy available.  Hudson v. Palmer, 468 U.S. 517, 533 (1984);
see N.H. Rev. Stat. Ann. 541-B:9(II) & (IV), and 541-B:14 (1997)
(providing a post-deprivation means of recouping property loss
attributable the State).

[6]Initially, Chambers sought preliminary injunctive relief
directing the NHDOC to provide him with glasses.  However,
according to an objection to Chambers' request filed by the NHDOC
(document no. 16), Chambers was seen by an eye doctor on April 4,
2007, and will be receiving new glasses in short order.  While
the provision of vision care may resolve issues related to a
preliminary injunction, Chambers may still raise a § 1983 claim
for the period of time during which he alleges he was denied
adequate vision care.

prior to having his kosher diet discontinued.  Chambers further
alleges that his kosher diet was not taken away as a result of a
sanction imposed pursuant to a disciplinary report.  Chambers
states that due to the denial of a kosher diet, he was denied the
ability to practice his religion.

4.   Denial of One-Handed Video Game

Chambers alleges that the NHSP canteen has a video game unit
that inmates can buy.  Chambers, however, has one hand, and
cannot play the video game that the canteen sells.  On September
13, 2006, Chambers wrote a request to Thyng, asking that he be
allowed to order a one-handed game from an outside source.  On
September 25, 2007, Chambers' request was denied by Cattell on
the basis that the cover of the one-handed game is opaque and
therefore jeopardizes institutional security.  Chambers alleges
that he grieved the denial of his request to the NHDOC
Commissioner, and that Deputy Commissioner Greg Crompton denied
the appeal.  Chambers alleges that this denial has deprived him
of a reasonable accommodation for his disability, because the
game sold in the canteen is also opaque.  Chambers asserts that
the decision to deny him a one-handed video game constitutes
discrimination against Chambers based on his disability.

Discussion[7]

I.   Claims Related to Medical Care

   A.   Section 1983 Claims

   Section 1983 creates a cause of action against those who, acting under color of State law, violate federal constitutional or statutory law.  See 42 U.S.C. § 1983[8]; Parratt v. Taylor, 451 U.S. 527, 535 (1981) (overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 330–331 (1986)); Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002).  In order for a defendant to be held liable under § 1983, his or her conduct must have caused the alleged constitutional or statutory deprivation.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978); Soto v.

---

   [7]The claims as identified herein will be considered for all purposes to be the claims raised in the complaint.  If Chambers disagrees with this identification of the claims, he must do so by proper objection to this Report and Recommendation or by properly moving to amend his complaint.

   [8]42 U.S.C. § 1983 provides that:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

13

<u>Flores</u>, 103 F.3d 1056, 1061–62 (1st Cir.), <u>cert. denied</u>, 522 U.S. 819 (1997).

      1.  <u>Eighth Amendment Claims</u>

Claims of inadequate medical care in the prison context arise under the Eighth Amendment, which protects prison inmates from prison officials acting with deliberate indifference to their serious medical needs.  <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 831 (1994).  To assert a viable cause of action for inadequate medical care, an inmate must first state facts sufficient to allege that the plaintiff had a serious medical need for which adequate care was not provided.  <u>Id.</u> at 832; <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981); <u>Estelle</u>, 429 U.S. at 106.  The inmate must then allege that a responsible prison official was aware of the need or of the facts from which the need could be inferred, and still failed to provide treatment. <u>Estelle</u>, 429 U.S. at 106.  A serious medical need is one that involves a substantial risk of serious harm if it is not adequately treated.  <u>Barrett v. Coplan</u>, 292 F. Supp. 2d 281, 285 (D.N.H. 2003); <u>Kosilek v. Maloney</u>, 221 F. Supp. 2d 156, 180 (D. Mass. 2002) (citing <u>Farmer</u>, 511 U.S. at 835–47); <u>see</u> <u>also</u> <u>Gaudreault v. Mun'y of Salem</u>, 923 F.2d 203, 208 (1st Cir. 1990),

cert. denied, 500 U.S. 956 (1991) (defining a serious medical need as one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention").

"Adequate medical care" is treatment by qualified medical personnel who provide services that are based on medical considerations and are of a quality consistent with the prudent professional standards in the community, tailored to an inmate's particular medical needs.  United States v. DeCologero, 821 F.2d 39, 42–43 (1st Cir. 1987).  This does not mean that an inmate is entitled to the care of his or her choice, simply that the care must meet minimal standards of adequacy.  Deliberate indifference may be found where the medical care provided is "so clearly inadequate as to amount to a refusal to provide essential care." Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991). Constraints inherent in a prison setting may affect the choice of care provided, and may be relevant to whether or not prison officials provided inadequate care with a deliberately indifferent mental state.  See Wilson v. Seiter, 501 U.S. 294, 302 (1991).

a.   <u>Pain Medication</u>

Here, Chambers has alleged that he was denied his prescribed medication, or denied the proper dosage of his prescribed medication, by Baker and Eppolito, first when they halved his morphine time-release dosage, and again, when they switched him from a time-release to a non-time-release formula.  Chambers also alleges that McKenna delayed Chambers' receipt of pain medication when she withheld his medication until he removed his lidocaine patches himself, even after she was instructed to remove the patches by Eppolito.

A prescription medication is, by definition, medical treatment that has been deemed necessary by a medical professional.  I find, therefore, that intentionally withholding Chambers' medication, giving him less than the necessary dosage of medication knowing that the lesser dose would not be effective, or unreasonably delaying Chambers' receipt of the medication is actionable under § 1983.  Accordingly, I find that Chambers has stated claims against Baker and Eppolito for intentionally undertreating his pain.  In my Simultaneous Order, I will direct that this claim be served on Baker and Eppolito. As to McKenna's delaying the dispensation of medication until

16

Chambers removed his lidocaine patches himself, I do not find that this act, in and of itself, constitutes a violation of Chambers' constitutional right to medical care.  Chambers states that Eppolito directed that pain medication should not be administered until after the lidocaine patches were removed. While it might not have been appropriate for McKenna to require Chambers to remove the patches, I do not find either that isolated incidents of requiring Chambers to remove his own patches or the several minutes of delay in receiving pain medication caused by that requirement constitutes a deliberate indifference to plaintiff's need for medication to rise to the level of a constitutional denial of adequate medical care in violation of the Eighth Amendment.

Chambers alleges he was denied pain medication he needed at regular intervals because unnamed prison officials refused to wake him in time to receive the medication on three occasions. Chambers does not allege that he suffered harm as a result of these three particular incidents and has failed, therefore, to state a claim of constitutional magnitude.  I recommend that any

Eighth Amendment claim Chambers intended to raise for a denial of medication, based on the failure to wake him up, be dismissed.[9]

        b.   <u>Vision Care</u>

     An allegation of inadequate vision care can support a valid § 1983 action challenging the improper denial of medical care. <u>See</u> <u>Koehl v. Dalsheim</u>, 85 F.3d 86, 88 (2d Cir. 1996).  Chambers claims that he was deprived of a necessary eye examination from December of 2006 until April 4, 2007, and that Thyng and Smiley deprived him of his eyeglasses from December 7, 2006 until at least April of 2007.  I find, therefore, that Chambers has alleged sufficient facts to state a cause of action for the denial of eyecare, denial of eyeglasses, and the attendant worsening of his vision.  Chambers has also alleged that Cattell and Wrenn were aware of, and failed to remedy, the denial of proper vision care.  In my Simultaneous Order, I direct

---

        [9]Chambers does not state with specificity what legal claims he intended to raise regarding the incidents where he slept through his medication dispensation time and therefore did not receive his medication, received three disciplinary reports, and was assessed three five dollar fines.  I have liberally construed these allegations as attempts to state claims under the Eighth Amendment, as addressed above, and under the ADA and the Rehabilitation Act, as addressed below.  I find that no other arguable claims for relief have been alleged regarding these three incidents.

that this claim proceed against defendants Thyng, Smiley, Cattell, and Wrenn.

   c. <u>Specialists and Medical Testing</u>

  Chambers alleges that he was denied the care of medical specialists to treat his respiratory condition and his chronic pain issues.  Chambers alleges that the NHDOC medical staff could not, or did not, adequately treat his pain, and failed to properly diagnose a serious respiratory condition that caused Chambers to be treated for breathing difficulties nine separate times.  Further, Chambers alleges that he was denied an MRI test that was recommended by his physical therapist.

  Chambers states that the medical staff at the prison agreed to send him to a pain management specialist, and to follow the recommendations of that person, but that a "committee" denied him access to the pain management specialist.  To that end, I find that Chambers has not alleged that any of the named defendants were responsible for denying him a pain specialist, and I recommend that claim be dismissed.  As to the denial of a respiratory specialist, Chambers does not allege that he did not receive any medical treatment for his breathing difficulties at all.  And while Chambers indicated that he requested a breathing

machine, he does not assert facts sufficient to demonstrate that the denial of a breathing machine rendered his care constitutionally inadequate.  Chambers said that he does not know what is causing his breathing problems, but that lack of knowledge, in itself, does not state a deprivation of adequate medical care.  I therefore recommend that this claim, too, be dismissed.  Similarly, Chambers has failed to state how the denial of an MRI recommended by a physical therapist deprives him of adequate medical care for a serious medical condition.  Chambers has not even set forth what part of his body requires an MRI or how that information is necessary to the provision of adequate medical care.  Accordingly, I recommend that the claims alleging denial of access to medical specialists and an MRI be dismissed.

　　　　2.  Equal Protection

　　　Chambers alleges that defendants violated his Fourteenth Amendment right to the Equal Protection of the laws when they denied him services based on his disability.  The Equal Protection Clause requires states to treat similarly situated persons alike.  Plyler v. Doe, 457 U.S. 202, 216 (1982); Toledo v. Sanchez, 454 F.3d 24, 33 (1st Cir. 2006), cert. denied, Univ.

of P.R. v. Toledo, ___ U.S. ___, 127 S. Ct. 1826 (2007).

However, the disabled are not a suspect class for equal

protection purposes.  Toledo, 454 F.3d at 33 (citing City of

Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).  As

such, "if special accommodations for the disabled are to be

required, they have to come from positive law and not through the

Equal Protection Clause."  Id. (quoting Bd. of Trs. of Univ. of

Ala. v. Garrett, 531 U.S. 356, (2001).  The ADA, which is such a

positive law, requires states to provide special accommodations

for the disabled, and is therefore more protective of the rights

of the disabled than is the Equal Protection Clause.  Tennessee

v. Lane, 541 U.S. 509, 549 (2004).  I find that, because Chambers

has failed to state any facts that allege his membership in a

protected class of persons, that he was treated differently than

other similarly situated persons, or that there was no rational

basis for the treatment he received, that Chambers has not

alleged any claims under the Equal Protection Clause.  I

therefore recommend that any intended equal protection claim be

dismissed from this action.

3.   <u>Denial of Free Medical Care</u>

Chambers alleges that the prison has no right to charge him for medical appointments if his inmate account does not have money in it.  Chambers offers no authority for his position, except to imply that he is somehow being punished for seeking medical care.  With the exception of his claim related to eyeglasses, which has been addressed above, Chambers has not alleged that he has been denied any requested medical appointments or care due to his lack of funds.

While the prison does have a constitutional obligation to provide medical care, there is no constitutional right to free medical care.  <u>See</u> <u>City of Revere v. Mass. Gen. Hosp.</u>, 463 U.S. 239, 245 (1983); <u>Reynolds v. Wagner</u>, 128 F.3d 166, 174 (3d Cir. 1997) (prisoner co-payment plan does not violate the Eighth Amendment); <u>Martin v. DeBruyn</u>, 880 F. Supp. 610, 615 (N.D. Ind. 1995), <u>aff'd.</u>, 116 F.3d 1482 (7th Cir. 1997) (Eighth Amendment guarantees only that inmates receive necessary medical care; it does not guarantee free medical care).  Because Chambers is not constitutionally entitled to free medical care, his complaint regarding medical expenses fails to state a claim upon which

22

relief may be granted under 42 U.S.C. § 1983.  Accordingly, I
recommend dismissal of this claim.

    B.   <u>ADA/Rehabilitation Act</u>

    Title II of the ADA provides that "no qualified individual
with a disability shall, by reason of such disability, be
excluded from participation in or be denied the benefits of the
services, programs, or activities of a public entity, or be
subjected to discrimination by any such entity."  42 U.S.C. §
12132.

> Pursuant to the plain language of Title II, a plaintiff
> must establish: (1) that he is a qualified individual
> with a disability; (2) that he was either excluded from
> participation in or denied the benefits of some public
> entity's services, programs, or activities or was
> otherwise discriminated against; and (3) that such
> exclusion, denial of benefits, or discrimination was by
> reason of the plaintiff's disability.

<u>Parker v. Universidad de P.R.</u>, 225 F.3d 1, 5 (1st Cir. 2000).
Title II of the ADA applies to inmates in correctional
facilities.  <u>See</u> <u>Pa. Dep't of Corrs. v. Yeskey</u>, 524 U.S. 206,
209-10 (1998).  "[P]risons provide inmates with many recreational
activities, . . . services, and educational and vocational
programs, all of which at least theoretically benefit the
prisoners (and any of which disabled prisoners could be excluded

from participation in.)" Id. at 210 (internal citations
omitted).

Section 504 of the Rehabilitation Act of 1973 provides in
relevant part:

> No otherwise qualified individual with a
> disability . . . shall, solely by reason of her or
> his disability, be excluded from the participation
> in, be denied the benefits of, or be subjected to
> discrimination under any program or activity
> receiving federal financial assistance . . .

29 U.S.C. § 794(a). While the Supreme Court has not explicitly
held that the Rehabilitation Act applies to prisons, other
federal courts have reached that conclusion. See, e.g., Stanley
v. Litscher, 213 F.3d 340, 343 (7th Cir. 2000) (citing cases).
To state a claim under § 504, Chambers must allege the following
elements: (1) that he is disabled; (2) that he sought services
from a federally funded entity; (3) that he was "otherwise
qualified" to receive those services from a federally funded
entity; and (4) that he was denied those services "solely by
reason of his . . . disability." Lesley v. Chie, 250 F.3d 47,
52-53 (1st Cir. 2001). The same standards apply to claims made
under the ADA and claims made under the Rehabilitation Act.
Quiles-Quiles v. Henderson, 439 F.3d 1, 5 (1st Cir. 2006) (citing
Calero-Cerezo v. DOJ, 355 F.3d 6, 11 n.1 (1st Cir. 2004)).

Accordingly, I will not engage in separate analyses for each statute, but will undertake an analysis under the ADA and apply my findings to the Rehabilitation Act claims.

      1.  <u>Passes</u>

Chambers alleges that by virtue of the fact that he has one arm, as well as other medical conditions, he is a disabled "qualified individual" under the ADA.  As such, Chambers alleges that he was denied the benefit of a "no twisting and turning" pass, the assistance of a nurse in removing his lidocaine patches, and an elevator pass by McKenna and Eppolito and slow movement and cell chair passes by Baker.  As such, Chambers attempts to allege that, as a result of his disabling conditions, he has been denied benefits, services, or programs to which he is entitled under the ADA and the Rehabilitation Act.  I find that Chambers' allegations that he was not assisted on one or two isolated occasions with removing his lidocaine patches, and that he was made to twist and turn on those occasions are insufficient to state a claim for a denial of benefits or services.  Also insufficient is Chambers' claim that he is entitled to be woken up to receive pain medication.  Even accepting Chambers' allegations as true, he alleges a de minimus infliction of pain,

and not a systemic denial of comfort measures made necessary by his disability that were removed as a result of his disability.

Chambers alleges that the denial of an elevator pass, chair pass and slow movement pass violated the ADA and the Rehabilitation Act, as those denials caused him significant discomfort related to his disability.  While the facts alleged, in terms of the precise reasons for denial of the passes and the specific qualifying disabilities that were offended by the denials are scant, I find that a liberal reading of the complaint alleges a denial of reasonable accommodations when he was not given elevator, cell chair, and slow movement passes.  I, therefore, will direct service of these claims, raised pursuant to the ADA and Rehabilitation Act, against McKenna, Eppolito, and Baker in the Simultaneous Order.

2.   Pain Medications

To the extent that Chambers intends to raise a claim under the ADA or Rehabilitation Act regarding the failure of prison officials to wake him for his pain medications, he has failed to do so.  While waking an inmate for necessary medications may be a reasonable accommodation for an inmate who cannot wake himself as a result of his disability, Chambers has not alleged that his

failure to wake up, and his need to be woken by prison officials, was caused by his disability.

II.   <u>Conspiracy Claim</u>

Chambers alleges that defendants Baker, McKenna and Eppolito engaged in a conspiracy to deprive him of his pain medications. A conspiracy to commit a civil rights violation is actionable under 42 U.S.C. § 1985(3) which states, in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

To state a claim under § 1985(3), the plaintiff must allege that the conspiratorial conduct complained of was motivated by some "racial, or perhaps otherwise class-based, invidiously discriminatory animus.'"   <u>Aulson</u>, 83 F.3d at 3 (quoting <u>Griffin</u>

v. Breckenridge, 403 U.S. 88, 91 (1971)).  As previously

discussed, Chambers has not alleged that he is a member of any

constitutionally protected class of persons or that he was the

object of any kind of constitutionally prohibited invidious

discrimination.  Accordingly, Chambers has not alleged a

conspiracy claim under § 1985(3), and I recommend that the

conspiracy claim be dismissed from this action.

III. Retaliation/Right to Petition the Government for a Redress
     of Grievances

     The First Amendment's guarantee of a right to petition the

government for a redress of grievances has been characterized as

"among the most precious of the liberties safeguarded by the Bill

of Rights."  United Mine Workers v. Ill. State Bar Ass'n, 389

U.S. 217, 222 (1967).  The right of petition, in the prison

context, means that inmates must be "permit[ted] free and

uninhibited access . . . to both administrative and judicial

forums for the purpose of seeking redress of grievances against

state officers."  Sostre v. McGinnis, 442 F.2d 178, 200 (2d Cir.

1971) (en banc), cert. denied, Sostre v. Oswald, 404 U.S. 1049

and Oswald v. Sostre, 405 U.S. 978 (1972) (overruled on other

grounds by Davidson v. Scully, 114 F.3d 12, 15 (2d Cir. 1999).

"[I]ntentional obstruction of a prisoner's right to seek redress

of grievances is precisely the sort of oppression that . . .
section 1983 [is] intended to remedy." Franco v. Kelly, 854 F.2d
584, 589 (2d Cir. 1988) (internal quotations omitted).

A prisoner's right to petition the government for a redress
of grievances under the First Amendment precludes prison
officials from retaliating against a prisoner by punishing a
prisoner for actions he takes in the exercise of those rights.
See Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995).  While
prison officials may make policy that is reasonably related to
legitimate penological interests, even at the expense of certain
constitutional rights, Turner v. Safley, 482 U.S. 78, 89-90
(1987), "actions otherwise supportable lose their legitimacy if
designed to punish or deter an exercise of constitutional
freedoms." Ferranti v. Moran, 618 F.2d 888, 892 n.4 (1st Cir.
1980) (citing McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979));
see also Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1993), cert.
denied, 512 U.S. 1209 (1994) (prison officials cannot lawfully
impose a disciplinary sanction against a prisoner in retaliation
for the prisoner's exercise of a constitutional right).
Retaliation can be inferred from the chronology of events.  See
Ferranti, 618 F.2d at 892 (chronology of events provided support

for inference of retaliation);  McDonald, 610 F.2d at 18 (same);

see also Oropallo v. Parrish, No. 93-1953, 1994 WL 168519, at *4

(1st Cir. May 5, 1994) (explaining how the challenged event must

follow the exercise of the constitutional right).

Chambers alleges that shortly after filing administrative

complaints and grievances against Baker, McKenna and Eppolito

complaining about their administration of his medical care, the

defendants acted to cut his pain medication in half, or to

eliminate some of his medication altogether.  Chambers claims

that there was no change in his need for medication, and that the

change occurred only because he filed complaints against these

defendants.  Accordingly, while the medical staff may

legitimately be able to make decisions for Chambers' care

pursuant to NHDOC policy, Chambers has alleged that the decision

to reduce his pain medications was not based on any medical

consideration, but was done in retaliation for grievances

Chambers filed.  For purposes of preliminary review, Chambers has

alleged the minimum facts necessary to state a § 1983 claim

against Baker, McKenna and Eppolito for retaliation in response

to Chambers' exercise of his First Amendment right to petition

the government for a redress of grievances, and I will direct, in

the Simultaneous Order, that this claim be served upon Baker,
McKenna and Eppolito.

IV.   Denial of Kosher Diet

    A.   Section 1983 Claims

        1.   First Amendment

The First Amendment's religion clauses provide that
"Congress shall make no law respecting an establishment of
religion, or prohibiting the free exercise thereof."  U.S. Const.
amend. I.  The first clause, the Establishment Clause, mandates
the separation of church and state.  The second clause, the Free
Exercise Clause, requires that government respect and not
interfere with the religious beliefs and practices of those
protected by the United States Constitution.  See Cutter v.
Wilkinson, 544 U.S. 709, 719 (2005).

A prisoner "retains those First Amendment rights that are
not inconsistent with his status as a prisoner or with the
legitimate penological objectives of the corrections system."
Pell v. Procunier, 417 U.S. 817, 822 (1974); see also Bell v.
Wolfish, 441 U.S. 520, 545 (1979) ("prisoners do not forfeit all
constitutional protections by reason of their conviction and
confinement in prison.").  The retained rights include the right

to the free exercise of religion.  <u>Cruz v. Beto</u>, 405 U.S. 319,
322 (1972).  Prisons must provide all inmates reasonable
opportunities to exercise their religious freedom.  <u>Id.</u> at 322,
n.2.  When a prisoner raises a Free Exercise Clause claim, the
prisoner must "establish that a challenged policy restricts the
inmate's free exercise of a sincerely held religious belief."
<u>Brown-El v. Harris</u>, 26 F.3d 68, 69 (8th Cir. 1994); <u>Barnett v.
Comm'r, N.H. Dep't of Corr.</u>, No. Civ. 98-305-JD, 2000 WL 1499490
at *2 (D.N.H. Apr. 26, 2000).

The Supreme Court has held that a prisoner's sincerely held
religious beliefs must yield, however, if contrary to prison
regulations that are "reasonably related to legitimate
penological interests."  <u>Turner</u>, 482 U.S. at 89; <u>see</u> <u>O'Lone v.
Estate of Shabazz</u>, 482 U.S. 342, 351-352 (1987) (finding that the
Constitution does not require the prison to sacrifice legitimate
penological objectives to satisfy an inmate's desire to exercise
his religion so long as an inmate is not deprived of all forms of
religious exercise).  A prison regulation must have a logical
connection to the legitimate governmental interests invoked to
justify it.  <u>Turner</u>, 482 U.S. at 89-90.  That connection may not
be "so remote as to render the policy arbitrary or irrational."

<u>Id.</u>  Prisons must provide all inmates reasonable opportunities to exercise their religious freedom.   See <u>Cruz</u>, 405 U.S. at 322 n.2. Free exercise claims brought by prisoners are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."  <u>Ford v. McGinnis</u>, 352 F.3d 582, 588 (2d Cir. 2003) (quoting <u>O'Lone</u>, 482 U.S. at 349); <u>see</u> <u>also</u> <u>Shaw v. Murphy</u>, 532 U.S. 223, 227–229 (2001).

Here, Chambers alleges that defendant Hoyt has denied him a kosher diet, which his religion requires.  Although the prison had previously provided him with a kosher diet, Chambers claims that Hoyt terminated his kosher meals without any due process. "[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights."  <u>McEachin v. McGuinnis</u>, 357 F.3d 197, 203 (2d Cir. 2004) (citing cases). These allegations suffice to state a claim upon which relief might be granted against Hoyt.

2.   <u>Fourteenth Amendment</u>

The Due Process Clause of the Fourteenth Amendment provides that the State shall not "deprive any person of life, liberty, or

property, without due process of law." U.S. Const. amend. XIV.
Because the First Amendment gives rise to a liberty interest in
practicing one's religion, before the State can burden the
practice of his faith, Chambers is entitled to due process. See
McEachin, 357 F.3d at 203. As Chambers alleges that his kosher
diet was taken away without any due process, I find that he has
stated a claim against Hoyt alleging a violation of the
Fourteenth Amendment's Due Process Clause. In my Simultaneous
Order, I will direct that the First and Fourteenth Amendment
claims related to the denial of Chambers' kosher diet be served
on defendant Hoyt.

    B.   Religious Land Use and Institutionalized Persons
        Act Claim

Chambers' allegation that he was denied a kosher diet can
also be construed as a claim brought under the Religious Land Use
and Institutionalized Persons Act ("RLUIPA") which, in certain
circumstances, prohibits government infringement on the practice
of religion. See Mayweathers v. Newland, 314 F.3d 1062, 1065
(9th Cir. 2002), cert. denied, Alameida v. Mayweathers, 540 U.S.
815 (2003). Under the RLUIPA, governmental imposition of a
"substantial burden on the religious exercise" of a prisoner is
prohibited, unless the burden "(1) is in furtherance of a

compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). The phrase "religious exercise" is to be construed liberally to include belief and professing of one's faith as well as the performance of physical acts, such as assembling with others to worship or participating in sacramental use of bread and wine. See Cutter, 544 U.S. at 720.

Construed liberally, the complaint alleges that Hoyt has substantially burdened Chambers' religious practice by denying him a kosher diet and thus preventing him from observing his faith. If true, these allegations may state a cognizable RLUIPA claim against Hoyt. Accordingly, in the Simultaneous Order, I will direct that the RLUIPA claim be served against Hoyt.

V.   Video Game Claim

Chambers alleges that denying him access to a one-handed video game violated the ADA's "reasonable accommodation" requirement. Essentially, he argues that if two-handed inmates have a video game available for purchase, that it is a violation of the ADA to deny him the opportunity to purchase a video game for one-handed persons.

35

As previously discussed, to state an ADA claim, a prison inmate must allege that he: (1) is a handicapped person, (2) that he is otherwise qualified, and that prison officials' actions either (3) excluded his participation in or denied him the benefits of a service, program or activity, or (4) otherwise subjected him to discrimination on the basis of his physical handicap.  42 U.S.C. § 12132.  Here, while Chambers has alleged that he is a handicapped person with a qualifying disability, and that he has been prevented from playing video games at the prison, he has failed to allege either that he was excluded from a prison program, service, or activity, or that the denial of a video game was based on his disability.

While access to the prison canteen is a service provided by the prison to inmates generally, it does not necessarily follow that access to each and every item in the canteen is a service, activity or program provided by the prison.  Inmates without money are not able to purchase items from the canteen.  Inmates receiving religious diets are not allowed to purchase food items from the canteen that do not comport with that diet.  Inmates can only purchase items that are in stock.  Chambers has not alleged that he was denied access to the canteen altogether due to his

disability.  Chambers offers no support for his assumption that
the prison is obligated to make each specific item available to
every inmate who wants to purchase it.  Accordingly, the prison
cannot be said to have provided video games for purchase as a
service of the prison.

Even if, by contorting the definition of the prison's
recreational activities, one could state an arguable claim that
denial of access to a video game is a denial of a prison-
sponsored activity, I find that Chambers has failed to allege
that the decision to deny him a one-handed video game was based
on his disability.  Chambers does not allege that the prison
refused to allow him to purchase or use a two-handed video game
because he only has one hand.  Instead, as Chambers admits, the
denial of a video game was based on security concerns.  Chambers
was advised that the one-handed video game he sought to purchase
from an outside source presented an unacceptable security risk
because the cover, or casing, of the game was opaque and did not
provide visual access to its contents.  Chambers argues that the
canteen video games are opaque.

The prison, however, might have security concerns regarding
accepting an opaque container from an outside source that they do

not have when dealing with containers that are provided to inmates within the prison.  Even if the prison officials' have established a double-standard for the canteen and outside video game's containers, the decision is still one based on security concerns, and not on the fact that Chambers is disabled.  See Carrasquillo v. City of New York, 324 F. Supp. 2d 428, 443 (S.D.N.Y. 2004) (prisoner who does not allege that denial of a reasonable accommodation was based on his disability cannot sustain an ADA claim).  Security concerns, as special concerns of prisons, are relevant factors to consider in determining the feasibility of an accommodation.  Crawford v. Ind. Dep't of Corrs., 115 F.3d 481, 487 (7th Cir. 1997) (rev'd on other grounds by Erickson v. Bd. of Governors of State Colleges & Univs. for Ne. Ill. Univ., 207 F.3d 945, 948 (7th Cir. 2000)) (citing Turner, 482 U.S. at 84-91, for the proposition that the circumstances that exist in a prison setting permit a degree of discrimination that would not be tolerated in a free environment).

Finally, I would be remiss if I failed to note that, while I can find no precise authority on point, the denial of access to a video game while one is incarcerated is hardly the sort of

38

deprivation that either the federal constitution or the ADA is designed to protect.  In fact, the legislative history of the Prison Litigation Reform Act, enacted in 1996, in part to control a perceived abundance of burdensome frivolous lawsuits being filed by prisoners in federal courts, includes, as an oft-cited example of a frivolous action by an inmate, a lawsuit filed for the denial of the use of a Gameboy video game.  See, e.g., Robbins v. Chronister, 402 F.3d 1047, 1053 (10th Cir. 2005) (citing 141 Cong. Rec. S14408-01 (daily ed. Sept. 27, 1995) (statement of Sen. Kyl)); Royal v. Kautzky, 375 F.3d 720, 730 (8th Cir. 2004), cert. denied, Royal v. Reid, 544 U.S. 1061 (2005) (same); Cruz v. Jordan, 80 F. Supp. 2d 109, 114 (S.D.N.Y. 1999) (same).  For all of these reasons, I recommend that Chambers' claim relating to the denial of a video game be dismissed.

VI.  Choice of Defendants

   A.   Supervisory Liability

   "Supervisory liability under § 1983 cannot be predicated on a respondeat theory, but only on the basis of the supervisor's own acts or omissions."  Aponte Matos v. Toledo Davila, 135 F.3d 182, 192 (1st Cir. 1998) (internal citations omitted).  A

supervisor must be either "a primary actor involved in, or a prime mover behind, the underlying violation." Camilo-Robles v. Zapata, 175 F.3d 41, 43-44 (1st Cir. 1999). There must be "an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization" to the violation alleged. Id. at 44.

Chambers has alleged that defendants Blaisdell, McLeod, Wrenn, Cattell, and Crompton have all been notified of the constitutional violations alleged here, and have failed to remedy the violations. Chambers has further alleged that these individuals are the supervisory prison officials with the authority to effect such a remedy. Accordingly, I will direct service against these individuals in their supervisory capacities.

B. Defendants Cox and Crompton

The only allegations against defendant Cox have to do with Chambers' appeal of the assessment of fees for sleeping through his medication dispensations. The only allegations against defendant Crompton have to do with the denial of a video game. Because I recommend that those claims be dismissed, I recommend that Cox and Crompton be dismissed as defendants to this action.

40

Conclusion

For the foregoing reasons, I recommend that the ADA and Rehabilitation Act claims alleging inadequate pain medication, the claims alleging denial of medical specialists, medical testing, failure to wake Chambers for medication, and denial of a video game, and the § 1983 claim alleging denial of free medical care be dismissed from this action.  I also recommend that defendants Cox and Crompton be dismissed from this action.  I direct, in my Simultaneous Order, that the § 1983 claim alleging an Eighth Amendment violation for denial of pain medication proceed against defendants Blaisdell, McLeod, Baker, Wrenn, and Eppolito, the § 1983 Eighth Amendment inadequate vision care claims proceed against defendants Thyng, Smiley, Cattell, and Wrenn, the § 1983 kosher diet, free exercise, and due process claims proceed against defendant Hoyt, and the ADA and Rehabilitation Act claims for the denial of accommodations in the form of passes proceed against defendants McKenna, Eppolito, and Baker.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to

appeal the district court's order.   <u>See</u> <u>Unauthorized Practice of</u>

<u>Law Comm. v. Gordon</u>, 979 F.2d 11, 13–14 (1st Cir. 1992);

<u>United States v. Valencia–Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).


                                    James R. Muirhead
                                    _____
                                    James R. Muirhead
                                    United States Magistrate Judge

Date:      May 30, 2007

cc:        Randolph L. Chambers, pro se